IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LUZ PARADOA** | : | **CIVIL ACTION** |
| | : | |
| v. | : | NO. 13-6012 |
| | : | |
| **PHILADELPHIA HOUSING** | : | |
| **AUTHORITY** | : | |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                                                                          **June 2, 2014**

In this action alleging race discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 1981 and the Pennsylvania Human Relations Act ("PHRA"),[1] the defendant, Philadelphia Housing Authority ("PHA"), has moved for summary judgment, arguing that the plaintiff, Luz Paradoa, has not met her burden of producing evidence showing that its decision to terminate her employment was based on her race.

Because we conclude that Paradoa has not established a *prima facie* case, we shall grant summary judgment.

**Background**

Paradoa began her employment at PHA in 2000 as a property manager for the Turnkey III Homeownership Program.[2] Her job entailed ensuring tenants were keeping up with lease obligations, assisting tenants with purchasing property and supervising several employees.[3] In 2008, Paradoa was promoted to the position of manager of

---

[1] At oral argument on May 14, 2014, Paradoa withdrew her national origin discrimination claims under Title VII of the Civil Rights Act and PHRA.  5/14/14 Hr'g Tr. 6:25-7:12.

[2] Def.'s Statement of Undisputed Material Facts ("Def.'s SUF") (Doc. No. 16) ¶ 12.

[3] *Id.* ¶ 13.

PHA's Community Partners Program.[4]  In that role, she was responsible for managing contracts for services to PHA residents, managing budgets, overseeing staff, and supervising contractors.[5]  Six or seven people reported to her.[6]

In December 2010, Angelique Martez, Paradoa's first cousin, joined Paradoa's team as a Family Self-Sufficiency Coordinator.[7]  She reported directly to Paradoa until January or February 2012, when she transferred to a position under a different supervisor.[8]

On July 17, 2012, a group of individuals supervised by Paradoa complained about her to Joanne Strauss, the Director of Human Resources for PHA.[9]  According to Strauss, "at least four" workers had complained that conversations between Paradoa and Martez, spoken in Spanish, made them feel uncomfortable, based on their observations of Paradoa and Martez laughing, pointing and making other gestures.[10]  Strauss directed them to file their complaints formally with Human Resources.[11]

In June or July 2012, Oddess Blocker, one of Paradoa's subordinates who approached Strauss, complained to Cheryl DeVose, an employment administrator

---

[4] *Id.* ¶ 14.

[5] *Id.* ¶ 18; Paradoa Dep. 21:11-23:7 (Doc. No. 16-5).

[6] Paradoa Dep. 23:4-7.

[7] *Id.* 34:6-16, 105:16-21; Angelique Martez Dep. 17:6-8, 18:13-16 (Doc. No. 16-9).

[8] Martez Dep. 19:20-21, 23:14-16, 24:22-25:2, 23:6-13.

[9] Strauss Dep. 39:2-5, 47:3-18, 48:18-49:2 (Doc. No. 16-6); Blocker Dep. 20:17-23 (Doc. No. 16-14).

[10] Strauss Dep. 36:2-10.

[11] *Id.* 47:23-48:5, 49:9-13.

within PHA's Human Resources Department.[12]  She accused Paradoa of bullying her.[13]  According to Blocker, Paradoa "belittled" her, spoke to her in an aggressive tone and used hand gestures, "singled her out," constantly criticized her and wrote her up "for no reason at all."[14]  Blocker also reported that Martez was getting favorable treatment.[15]  DeVose testified that she received complaints about Paradoa from two other employees.[16]  DeVose interviewed each of the individuals and the employees identified as witnesses to their allegations.[17]

In August 2012, DeVose interviewed Paradoa.[18]  Angela Cabrera, a management trainee in PHA's Human Resources Department, was present at the interview.[19]  According to Paradoa, DeVose asked her three questions bearing on her nationality, race and language.[20]  Specifically, she claimed DeVose asked her whether she was Hispanic, spoke Spanish, and spoke Spanish at work around co-workers.[21]

---

[12] Def.'s SUF ¶ 4, 36.

[13] Blocker Dep. 10:11-17.

[14] Def.'s SUF ¶ 36; Blocker Dep. 10:23-11:3, 26:23-27:7.

[15] Blocker Dep. 10:18-21, 11:4-24.

[16] DeVose Dep. 11:23-12:19 (Doc. No. 16-7).

[17] Def.'s SUF ¶¶ 38, 39, 42.

[18] *Id.* ¶ 44.

[19] *Id.* ¶ 5; Paradoa Dep. 102:8-14; Straus Dep. 33:3-18; DeVose Dep. 17:1-10.

[20] Paradoa Dep. 103:18-104:3.

[21] Q: Did she ask you any additional questions regarding your race or nationality?
A: Other than, do I speak Spanish, do I speak Spanish when I'm at work, do I speak Spanish around co-workers, no; that was pretty much it.
Q: So, she asked, "Are you Hispanic" She asked if you speak Spanish at work and she asked if you speak Spanish with co-workers.  Did she ask any other questions regarding your race or national origin?
A.   Not that I recall.
*Id.* 106:19-107:5.

DeVose testified that she asked Paradoa whether she had spoken Spanish with Martez because the complainants alleged that Paradoa and Martez talked about other employees in Spanish.[22]  DeVose denied asking Paradoa about her nationality or whether she was Hispanic.[23]  Cabrera confirmed that DeVose asked Paradoa whether she spoke Spanish with her cousin about other co-workers.[24]  Cabrera also testified that DeVose never asked Paradoa about her national origin or whether she was Hispanic.[25]

DeVose reported the results of her investigation to Strauss.[26]  DeVose advised that the complaining employees were credible and concluded that Paradoa had violated several employee handbook provisions when interacting with her subordinates.[27]  She recommended discharge.[28]

In its Human Resources Policy Manual, PHA explained its nepotism policy concerning the hiring and work assignments of employees and immediate family members or relatives.[29]  The policy provided that direct supervision of an employee by his or her "relative," as defined by the policy, constituted a conflict of interest that a supervisor was required to report to the Human Resources Department.[30]  A "first

---

[22] DeVose Dep. 24:14-24.

[23] *Id.* 42:24-43:7.

[24] Cabrera Dep. 15:16-23.

[25] *Id.* 17:25-18:8.

[26] Def.'s SUF ¶ 3; Strauss Dep. 10:6-17.

[27] Strauss Dep. 10:18-25.

[28] DeVose Dep. 37:24-38:3.

[29] Def.'s SUF ¶¶ 28, 30; *id.* Ex. J.

[30] Def.'s SUF ¶¶ 31, 33; *id.* Ex. J at 1-2.

cousin" was included within the definition of a "relative."[31]  Paradoa testified that when she was hired, she believes she was told that there was a manual, but it was not provided to her at that time.[32]  She added that she "may have" reviewed the manual when she started with PHA.[33]

In 2012, PHA distributed an employee handbook, which described the policies and procedures governing PHA employees.[34]  The policies relevant to this case are those addressing non-fraternization and bullying.  Section 3.8 of PHA's Standards of Ethical Conduct, PHA's Non-Fraternization Policy, prohibited employees from supervising a person with whom he or she had a "close relationship."[35]  A first-cousin relationship constituted a "close relationship."[36]  Section 5.2 of PHA's Workplace Management Policy, Workplace Bullying, provided that PHA would not tolerate workplace bullying.[37]  Bullying is defined as "[r]epeated inappropriate behavior, either direct or indirect, whether verbal, physical or otherwise, conducted by one or more persons against another or others, at the place of work and/or in the course of employment."[38]  Examples of bullying include non-verbal threatening gestures, glances which can convey threatening messages, persistent singling out of one person, persistent hurtful name calling, shouting, raising one's voice at an individual and

---

[31] Def.'s SUF ¶ 32; *id.* Ex. J at 2.

[32] Paradoa Dep. 57:3-5.

[33] *Id.* 57:10-12.

[34] Def.'s SUF ¶ 8; *id.* Ex. H; Paradoa Dep. 53:17-20.

[35] Def.'s SUF ¶ 21; *id.* Ex. H at 14, 20.

[36] Def.'s SUF ¶ 22; *id.* Ex. H at 20.

[37] Def.'s SUF ¶ 25; *id.* Ex. H at 38.

[38] Def.'s SUF ¶ 26; *id.* Ex. H at 38.

repeatedly accusing someone of errors which cannot be documented.[39] Penalties for violations of the nepotism and bullying policies included termination of employment.[40]

Paradoa knew or should have known of these policies and the consequences of violating them. She acknowledged that she received the employee handbook, was familiar with it, and "probably" read through it when it was distributed "probably [in] spring [of 2012]."[41]

Based on her understanding of the policies and the results of DeVose's investigation, Strauss determined that Paradoa had violated the nepotism, workplace bullying, principles of ethical conduct, and non-fraternization policies.[42] After consulting with Dr. Little, Deputy Executive Director of Resident Services, and Michael Muffley, the Chief Investigator of the Office of Audit and Compliance, Strauss decided to suspend Paradoa's employment with a recommendation for discharge.[43] On September 14, 2012, Strauss notified Paradoa that her employment was terminated due to her violations of four PHA policies.[44]

On December 6, 2012, Paradoa filed a written charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC"). She alleged discrimination on the basis of her race

---

[39] Def.'s SUF ¶ 27; *id.* Ex. H at 38-39.

[40] Def.'s SUF ¶¶ 24-25; *id.* Ex. H at 20, 38.

[41] Paradoa Dep. 53:1-24.

[42] Def.'s SUF ¶¶ 58-59.

[43] *Id.* ¶ 56; Compl. ¶ 20.

[44] Def.'s SUF ¶ 63; *id.* Ex. L.

and national origin.[45]  On July 16, 2013, the United States Department of Justice issued a notice of right to sue.[46]  On October 15, 2013, Paradoa filed a complaint in this court.[47]

## Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party.  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere

---

[45] Compl. ¶ 14.

[46] *Id.*

[47] In her complaint, Paradoa alleged that PHA excluded her from resident leader roundtable meetings, event planning meetings and various events; ignored her at an event coordinated by her department; and failed to support and encourage her.  Compl. ¶¶ 19-40, 65.  But, these actions do not form the bases of her claims.  At oral argument, Paradoa limited her claim to wrongful termination:

> The Court: Can you tell me what the employment action specifically forming the basis of your claim [is]?
> Mr. Ely: The termination.
> The Court: Termination only?
> Mr. Ely: Yes, Your Honor.

5/14/14 Hr'g Tr. 1:21-2:1.

7

existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## Discussion

Disparate treatment claims under Title VII, § 1981, and the PHRA are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[48] Under this analysis, Paradoa must first establish a *prima facie* case of disparate treatment and termination by showing that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was fired from that position; and (4) nonmembers of the protected class were treated more favorably, that is, under circumstances giving rise to an inference of discrimination. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000). If Paradoa establishes a *prima facie* case, the burden of production then shifts to PHA to identify a legitimate non-discriminatory reason for the termination. *Id.* at 319. If PHA satisfies that burden, Paradoa must produce evidence from which a reasonable fact finder could conclude

---

[48] *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (holding that state law claims for race discrimination pursuant to the PHRA are analyzed under the same framework as claims brought under Title VII); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) ("[T]he elements of a § 1981 claim are identical to the elements of a Title VII employment discrimination claim."). Significantly, the core of a § 1981 action is *intentional* discrimination. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002).

that the employer's proffered reason was merely a pretext for race or national origin discrimination. *Id.* This final burden of production "merges with the ultimate burden of persuading [the jury] that [she] has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

To overcome a motion for summary judgment, Paradoa must establish a causal connection between her race and the alleged adverse employment action. *Sarullo*, 352 F.3d at 798. A "subjective belief" that race played a role in the employment decision does not establish an inference of discrimination. *Wilson v. Blockbuster, Inc.*, 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008) (citing *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000)).

PHA argues that Paradoa has not made out a *prima facie* case for discrimination based on her race. It does not dispute that Paradoa is a member of a protected class, she was qualified for the position of manager of Community Partners Program, and her suspension and termination constituted adverse employment actions.[49] It contends that she has not presented any evidence that other similarly-situated employees were treated more favorably or that the circumstances of her termination raise an inference of discrimination. *See Pivorotto v. Innovative Sys.*, 191 F.3d 344, 357 (3d Cir. 1999).

Paradoa has not come forward with any evidence that non-Hispanic employees were disciplined differently than her or other Hispanic employees for the same conduct which PHA cited as grounds for her termination.[50] Instead, she contends that the

---

[49] Def.'s Mem. at 5.

[50] "When using comparators to establish pretext, plaintiff must show that the individuals engaged in the same conduct as him and that they shared in common all relevant aspects of his employment." *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 514 (E.D. Pa. 2010).

circumstances surrounding her suspension and termination raise an inference that the actions were motivated by a discriminatory animus.

Opposing summary judgment, Paradoa makes three arguments. First, she claims that PHA failed to explain how she violated its policies.[51] With respect to the 1999 "anti-nepotism" policy, she claims there is no evidence to indicate what period of time the policy covered, when she received a copy of the policy, whether she agreed to be bound by it and how she violated it.[52] Paradoa points out that Martez testified that when she was hired, she informed PHA that she knew somebody who worked for the agency and PHA did not follow-up on that information.[53]

Second, Paradoa claims that DeVose asked her "inappropriate and improper" questions regarding her race and national origin during the investigative interview.[54] According to Paradoa, DeVose asked her if she was Hispanic and spoke Spanish at work and around co-workers.[55] She contends that despite the lack of evidence to

---

[51] Resp. in Opp. to Def.'s Mot. for Summ. J. (Doc. No. 18) at 8.

[52] *Id.*

[53] *Id.* At oral argument, Paradoa conceded that Martez did not identify Paradoa by name. Paradoa also conceded that she had the obligation to report her relationship with Martez:

> Mr. Ely: The cousin disclosed the fact that they were related . . . .
> The Court: No, no, that is not what happened according to the record. The record is . . . that Martez told PHA when she was hired that she was related to someone in PHA.
> Mr. Ely: But my recollection and I may be wrong Judge is that our client also removed herself from the panel in interviewing her. It was not a secret.
> The Court: Okay. Let's assume she did. She still supervised her. The obligation was not [on] Martez; the obligation rested on Paradoa.
> Mr. Ely: I would agree with all of that for summary judgment purposes.
> The Court: Wait a minute. Wait a minute. The record does not disclose that Martez said that I am related to Paradoa.
> Mr. Ely: I would agree with that.

5/14/14 Hr.'g Tr. 15:17-16:12.

[54] Paradoa Dep. 103:14-104:03, 107:22-108:2.

[55] *Id.* 106:01-03, 106:21-107:02.

suggest that Paradoa and Martez were speaking negatively about their coworkers and the lack of a policy prohibiting speaking Spanish at work, DeVose recommended termination.[56]

Third, Paradoa urges us to make a credibility determination by discrediting Blocker's testimony as that of a convicted felon.[57] She requests that we take judicial notice of Blocker's criminal history record, contending that if she is "permitted to impeach Blocker on her criminal history, a reasonable jury could determine that her complaints about Plaintiff lacked credibility and were motivated by racial animus."[58]

At oral argument, Paradoa's counsel summarized her argument that she met her burden of establishing an inference of discrimination.[59] He relied on the two questions DeVose asked regarding race during the investigatory interview – whether Paradoa was Hispanic and whether she spoke Spanish at work and around co-workers.[60] These

---

[56] Resp. in Opp. to Def.'s Mot. for Summ. J. at 8-9.

[57] *Id.* At oral argument, Paradoa conceded that we cannot make a credibility determination:

> The Court: Blocker's credibility is not for me to determine, is it?
> Mr. Ely: No.
> The Court: And whether or not the complaints were credible is not for me to determine at this stage, is it[?]
> Mr. Ely: No.

5/14/14 Hr'g Tr. 11:6-12.

[58] Resp. in Opp. to Def.'s Mot. for Summ. J. at 9.

[59] The Court: Are you saying that two questions give rise to a prima facie case?
Mr. Ely: To the fourth element of the prima facie case. The only one that is disputed. Those comments alone establish inference.

5/14/14 Hr'g Tr. 7:16-20.

> The Court: So you want to rely on the comments?
> Mr. Ely: The comments alone, correct, are enough to show inference of discrimination.

*Id.* 16:25-17:3.

[60] *Id.* 19:20-20:3; Paradoa Dep. 106:01-03, 106:21-107:02.

questions, according to Paradoa, reflect DeVose's discriminatory animus. She contends that despite the lack of evidence to suggest that Paradoa and Martez were speaking negatively about their coworkers and the lack of a policy prohibiting speaking Spanish at work, DeVose then recommended termination.

Paradoa concedes that PHA had an obligation to conduct the investigation once the complaints were lodged.[61] She acknowledged that DeVose's inquiry regarding speaking Spanish at work was relevant to that investigation.[62] DeVose asked the question because Paradoa's subordinates complained that Paradoa was speaking Spanish about them.

DeVose's inquiry regarding Paradoa's speaking Spanish at work does not make out a claim of discrimination. Language is not a protected category under Title VII. *See Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) (stating, in an equal protection context, that "[l]anguage, by itself, does not identify members of a suspect class"); *Pacheco v. N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 612 (S.D.N.Y. 2009) ("Title VII does not expressly identify language as a protected class."); *Brewster v. City of*

---

[61] The Court: When I asked you the question is what was the context? The context was that there was a complaint of bullying. It does not matter whether or not that was a credible complaint. There was an obligation on PHA to conduct the investigation.
Mr. Ely: Assuming a credible complaint, I would agree.
The Court: Well, [a] complaint is made. They would be accused of not following their process if there was a complaint formally made, so they had to investigate.
Mr. Ely: Yes.

5/14/14 Hr'g Tr. 12:24-13:10.

[62] The Court: So they investigate and one of the claims is that they are talking Spanish in front of these people and criticizing them, their co-employees[.] So that the question is, do you speak Spanish in that context –
Mr. Ely: Correct.
The Court: – is absolutely relevant to the investigation, is it not?
Mr. Ely: I would agree but again . . . [the employees could not have known that Paradoa was speaking negatively about them because none of them spoke Spanish].).

5/14/14 Hr.'g Tr. 13:11-14:4.

*Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) (noting that Title VII "does not protect against discrimination on the basis of language"); *Betances v. Prestige Decorating & Wallcovering, Inc.*, No. 05-4485, 2006 WL 963877, at *2 (S.D.N.Y. Apr. 13, 2006) (holding that "non-English speakers . . . are not a protected class under Title VII"). Nor are language and race interchangeable. *See Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010) ("While Title VI prohibits discrimination on the basis of national origin, language and national origin are not interchangeable."). Although the Supreme Court has opined, in the context of jury selection, that "it may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis," it rejected a claim that juror exclusion on basis of ability to speak Spanish is equivalent to striking on basis of ethnicity. *Hernandez v. New York*, 500 U.S. 352, 353-54 (1991).

Significantly, Paradoa does not argue that her language and race were so closely intertwined that "punish[ing her] for speaking Spanish to her co-worker"[63] was equivalent to firing her on the basis of her race. Indeed, there are no facts suggesting that her termination was linked to her speaking Spanish at work. Furthermore, as Strauss testified, speaking Spanish at work is not a violation of any PHA policy.[64]

Assuming, as we must, that Paradoa's allegations are true and the interview transpired exactly as she described, she still has presented no evidence, direct or indirect, linking racial bias to Strauss's decision to terminate her. She has not shown how DeVose's questions about being Hispanic and speaking Spanish around other

---

[63] Resp. in Opp. to Def.'s Mot. for Summ. J. at 12.

[64] Strauss Dep. 19:17-20:1.

employees revealed a discriminatory animus that instigated Strauss's decision to fire her. We cannot infer from DeVose's questions that she was biased or driven by an improper animus.

Even if Paradoa could establish a *prima facie* case of discrimination, she has not proffered any evidence of discriminatory motive to overcome PHA's legitimate non-discriminatory reason for her termination.

A defendant can satisfy its "relatively light" burden of showing a non-discriminatory reason for its action, *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013),[65] by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). PHA's burden is one of "production, . . . not persuasion." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). It need not prove that the tendered reason "*actually motivated*" its decision. *Fuentes*, 32 F.3d at 763 (emphasis in original). It only needs to show that its decision could have been motivated by the proffered legitimate, non-discriminatory reason. *Id.*; *see also Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

PHA asserts that Paradoa was terminated because she violated several PHA policies. The violations were Paradoa's failure to disclose that her first cousin, Martez, was under her supervision, and her bullying her subordinates.

Violation of an employer's policies is a legitimate, non-discriminatory reason for discharge. *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 51-52 (2003); *Parikh v.*

---

[65] *See also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (describing this step as a "minimal burden").

14

*UPS*, 491 F. App'x 303, 307 (3d Cir. Aug. 7, 2012) (unpublished); *Slater v. Susquehanna Cnty.*, 465 F. App'x 132, 137 (3d Cir. 2012) (unpublished).

Paradoa objects that the complaints of the subordinates, other than Blocker's, are inadmissible hearsay. Only Blocker was deposed and PHA has not submitted any affidavits or declarations by the other complainants. Blocker testified that she filed a complaint with Human Resources because Paradoa was bullying her and favoring Martez over other employees in her department. Paradoa attacks Blocker's testimony because Blocker "is a convicted drug dealer and felon."[66] According to Paradoa, "Blocker's testimony, as a whole, is suspect and creates genuine issues of material fact for trial with respect to pretext."[67] Essentially, she argues that without Blocker's incredible testimony, PHA has no evidence of misconduct supporting the violations.

Paradoa's argument fails. She does not argue that PHA will not be able to produce admissible evidence of the complaints at trial.

Rule 56(c)(2) was amended in 2010 to provide that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Thus, "the objection [now] contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Ridgell v. Astrue*, No. 10-3280, 2012 WL 707008, at *9 (D. Md. Mar. 2, 2012) (quoting *Foreword Magazine, Inc. v. OverDrive Inc.*, No. 10-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011)); *see also Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 at n.2 (3d Cir. 2000) ("[H]earsay statements can be considered on a

---

[66] Answer to Def.'s SUF ¶ 34 (Doc. No. 18-1).

[67] *Id.* As we noted in footnote 57, Paradoa agreed that we cannot make a credibility determination at this stage.

motion for summary judgment if they are capable of admission at trial."); *Barr v. Cnty. of Clarion*, 417 F. App'x 178, 180 n.4 (3d Cir. 2011) (unpublished).

Paradoa does not dispute that her subordinates complained to DeVose that she had bullied them. She challenges the truth of the complaints. Significantly, Paradoa does not deny that she did not report that she was supervising her cousin in violation of the nepotism and non-fraternization policies.

Whether Paradoa bullied anyone is not dispositive. The issue is what Strauss and DeVose believed Paradoa had done. PHA offers the statements of the subordinates to show what DeVose's investigation revealed and what Strauss considered in deciding to terminate Paradoa. *See* Fed. R. Evid. 801(c)(2) ("'Hearsay means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."). In other words, statements of employees that DeVose, Strauss and Blocker repeated in their testimony are not inadmissible hearsay because they are offered to explain why PHA acted in terminating Paradoa's employment. Paradoa offers nothing to suggest that DeVose or Strauss had no basis to believe what the complainants reported.

At the pretext stage of the *McDonnell Douglas* test, we must accept PHA's evidence supporting its alleged reason for terminating Paradoa as true. *See Fuentes*, 32 F.3d at 762; *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 744 (9th Cir. 2004). Citing the violation of its policies as the grounds for termination, PHA has carried its light burden of production to establish a legitimate, non-discriminatory reason for its employment decision.

Because PHA articulated a non-discriminatory reason, the burden shifts back to Paradoa, who can, by direct or circumstantial evidence, either discredit PHA's proffered justification or present evidence that her termination was because of her race. *Fuentes*, 32 F.3d at 764. A plaintiff may discredit the proffered reason by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, . . . , and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (emphasis removed) (citations and internal quotation marks omitted); *see also DeAngelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 580 (E.D. Pa. 2010). A plaintiff can meet her burden by "point[ing] to evidence with sufficient probative force" from which a fact-finder could conclude that the adverse employment action was more likely than not the result of discrimination. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998); *Fuentes*, 32 F.3d at 764. Examples of such evidence include previous acts of discrimination against the plaintiff, discrimination against other persons within the plaintiff's protected class or within another protected class, or a showing that the defendant has treated similarly situated non-Hispanic employees more favorably. *Simpson*, 142 F.3d at 645.

Making bald, conclusory statements that the articulated reason is not credible is insufficient. *See Olympic Jr., Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972); *see also Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that conclusory allegations of discrimination are insufficient to avoid summary judgment). Rather, the plaintiff must produce evidence that will "allow a factfinder reasonably to

infer that [the employer's] proffered non-discriminatory reason[] was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764 (internal citations omitted); *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (holding that plaintiff is required "to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision"); *Stanziale v. Jargowsky*, 200 F.3d 101, 106-07 (3d Cir. 2000) (upholding summary judgment where the plaintiff attempted to show pretext by disputing the importance of the difference in educational qualifications between himself and the person hired rather than challenging the disparity itself or proving that the qualifications at issue bore no actual relationship to the employment being sought).

Paradoa does not rely upon direct evidence to establish pretext. Instead, she cites facts that she claims undermine PHA's proffered explanation for firing her. Primarily, she stresses the lack of a signed acknowledgement that she received the 1999 nepotism policy and the employee handbook; the absence of a prohibition against speaking Spanish at the workplace; and the lack of evidence that she and Martez talked negatively about other employees in Spanish. She also contends that DeVose's questions during the interview, considered alone, show pretext.[68]

---

[68] The Court: Tell me all the indirect evidence you have to show that their excuse was pretext?
Mr. Ely: The comments made –
The Court: – as part of their case?
Mr. Ely: The same evidence, the comments, made at the time of the meeting that led to her termination. Are you Hispanic? Do you speak Spanish?

5/14/14 Hr'g Tr. 18:1-8.

The Court: I want to be clear. The evidence that you rely on that gets you to the jury which satisfies your burden at that last stage, them having shown a nondiscriminatory reason is the two comments during the interview?
Mr. Ely: That's correct.
The Court: Are you Hispanic? And did you speak Spanish.

The focus of the pretext inquiry is on whether discriminatory animus motivated the employer. *Fuentes*, 32 F.3d at 763-65. "What matters is the perception of the decision maker." *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1304 (7th Cir. 1991) (noting that the inquiry regarding genuineness of the nondiscriminatory reason "is limited to whether the employer's belief was honestly held"); see also *Holder v. City of Raleigh*, 867 F.2d 823, 829 (4th Cir. 1989) ("[A] reason honestly described but poorly founded is not a pretext."); *Hicks v. Arthur*, 878 F. Supp. 737, 739 (E.D. Pa. 1995) ("[A]n ill-informed decision or an ill-considered decision is not automatically pretextual if the employer has given an honest explanation."), *aff'd*, 72 F.3d 122 (3d Cir. 1995)).

In this case, DeVose investigated the complaints and determined that, based on the statements of the people she interviewed, Paradoa had violated PHA policies by supervising her first cousin and bullying her subordinates. She reported the results of her investigation to Strauss, who consulted with Dr. Little and Muffley. Together, they decided that termination was warranted.

Significantly, Paradoa's contention that Martez disclosed to PHA that she had a relative working at the agency does not contradict Strauss's determination that Paradoa herself failed to report the relationship to PHA. Paradoa does not deny supervising Martez. She does not dispute that she did not report the relationship. Nor does she allege that she was not aware of the impropriety of directly supervising her cousin.

To prevail on a race-based discrimination claim, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765. She

---

Mr. Ely: Correct.
The Court: And that is it? I want to make sure I got this whole thing.
Mr. Ely: That's right. Being Hispanic has nothing to do with their investigation.

*Id.* 19:20-20:7.

must show "that [the plaintiff's proffered reason] was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Cred. Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). Paradoa has made no such showing. She has not carried her burden to show that PHA's proffered reason was mere pretext for intentional discrimination. Therefore, we shall grant PHA's motion for summary judgment.

## Conclusion

Paradoa has failed to make out a *prima facie* case for discrimination. Even if she had, she failed to produce evidence of pretext. Therefore, we shall grant PHA's motion for summary judgment on all claims.[69]

---

[69] To sustain a claim under § 1981, "a plaintiff must show (1) that [she] belongs to a racial minority; (2) 'an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in' § 1981, including the right to make and enforce contracts." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002) (quoting *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)). Section 1981 claims are evaluated pursuant to the same burden-shifting framework as Title VII claims. Accordingly, for the same reasons stated above, we shall grant PHA's motion for summary judgment with respect to the § 1981 claim.